# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                              )
JORGE LUIS DE JESUS,          )
                              )
                 Plaintiff,   )
                              )        Civil Action
v.                            )        No. 18-10079-PBS
                              )
NANCY A. BERRYHILL,           )
Acting Commissioner of the    )
Social Security Administration, )
                              )
                 Defendant.   )
_____)


## MEMORANDUM AND ORDER

September 26, 2019

Saris, C.J.

## INTRODUCTION

Plaintiff Jorge Luis de Jesus bring this action under 42
U.S.C. § 405(g) for judicial review of a final decision denying
his application for Supplemental Security Income ("SSI").
Plaintiff suffers from a number of physical and mental
conditions, including diabetes mellitus, osteoarthrosis,
hypertension, sleep apnea, obesity, major depression, anxiety,
and post-traumatic stress disorder ("PTSD"). Plaintiff takes
issues with the findings of the Administrative Law Judge ("ALJ")
who denied his application as they relate to his physical
conditions. Specifically, he contends the ALJ erred by

(1) finding his bilateral osteoarthritis of the knee to be a non-severe condition, (2) failing to properly evaluate his pain symptoms, and (3) discounting the opinion of his primary care physician. Plaintiff also faults the ALJ for failing to properly consider his English illiteracy in assessing his ability to find gainful employment. Defendant moves to affirm the ALJ's decision.

For the reasons set forth below, the Court **ALLOWS** Plaintiff's motion to remand (Dkt. No. 16) and **DENIES** Defendant's motion to affirm (Dkt. No. 21).

## **FACTUAL BACKGROUND**

Plaintiff was 45 years old on March 6, 2015 when he initially filed an application for SSI benefits. Plaintiff grew up in Puerto Rico and stopped attending school in the fourth grade at age 12. Plaintiff moved to the United States in 1993 at age 24. Since coming United States, Plaintiff has worked as a cashier and assistant manager at Dunkin Donuts, a hotel housekeeper, and a hand packer of newspaper fliers. He was last employed in 2012. He is currently homeless and has lived in a shelter since 2010. Plaintiff also has a history of opioid dependence and he was treated with Suboxone through the relevant period.

## I.  __Medical History__[1]

On November 18, 2011, Plaintiff saw his primary care physician, Dr. Pablo Hernandez, at the South End Community Health Center due to left foot pain. On December 13, 2011, Plaintiff complained to Dr. Hernandez about back pain. On January 8, 2012, Plaintiff went to the emergency room complaining of pain in the left knee and left foot. A lower extremity evaluation revealed tenderness to palpitation of the posterior and medial knee. The left knee evaluation showed, "no deformity, no ecchymosis, no swelling, no hematoma, no erythema, no warmth, full range of motion." R. 482. The left leg evaluation showed "no abrasions, no crepitus, no ecchymosis, no induration, no lacerations, no obvious deformity, no redness, distal pulses intact, swelling noted, proximally posteriorly, tenderness noted." Id. The left foot evaluation showed, "no ecchymosis, no swelling, no puncture wounds, no laceration, no hematoma, 5th metatarsal nontender, full range of motion, tendon function normal." Id.

On February 25, 2012, Dr. Hernandez examined Plaintiff and noted that Plaintiff was suffering from "hypertension," "hypercholesterolemia," "open fracture shaft of tibia,"

---

[1]     The ALJ's decision and the administrative record contain additional medical evidence concerning Plaintiff's mental conditions. The Court does not recount that evidence here, however, because it is not relevant to Plaintiff's claims.

"obesity," and "diabetes mellitus." R. 446. On June 11, 2012, Plaintiff again reported experiencing pain in his left shoulder. Dr. Hernandez noted that Plaintiff had a limited range of motion and that the pain was exacerbated if Plaintiff kept his arm in the same position for a prolonged period of time. The intensity of the pain was recorded as 8/10. Plaintiff continued to complain of severe left shoulder pain at a follow-up visit with Dr. Hernandez in July 2012 and an emergency room visit in August 2012.

On September 27, 2012, Plaintiff returned to Dr. Hernandez complaining of lower back pain that radiated to his feet and which was exacerbated by the cold. Plaintiff also complained of knee pain radiating to his feet, increased pain in the cold, and difficulty ambulating. Dr. Hernandez noted that Plaintiff had no noticeable swelling but did have tenderness to several maneuvers, a mild decrease in muscle strength over the left shoulder, and knee pain. Plaintiff rated his pain as 10/10. Dr Hernandez prescribed him Indomethacin 50 mg and Percocet 325 mg for the pain.

A month later, on October 29, 2012, Plaintiff again complained of severe lower extremity pain involving his knees, ankle, and feet. Plaintiff reported to Dr. Hernandez 9/10 pain intensity that had worsened with the onset of cold weather. Plaintiff also reported that usually 10 mg of oxycodone a day

was enough to carry on daily activities but that none of the other medications he tried over the past two years had really worked.

On that same day, a rheumatologist, Dr. Patrick Hook, examined Plaintiff for bilateral lower extremity pain. Dr. Hook noted Plaintiff's "physical exam is largely benign with no suggestion of an underlying inflammatory arthritis." R. 519. "[Plaintiff's] inflammatory markers . . . were unremarkable." Id. Dr. Hook also opined that Plaintiff, "may be experiencing some symptoms of patellofemoral syndrome mostly in his right knee." Id. He noted that Plaintiff was getting "adequate pain relief from Percocet," but prescribed Voltaren cream for additional pain relief. Id. Dr. Hook also urged Plaintiff to lose weight to aid in relieving bilateral knee symptoms. Id.

On November 1, 2012, Plaintiff was seen by his new PCP, Dr. Christine Pace at Boston Medical Center. Dr. Pace noted many of the same ailments identified by Dr. Hernandez, including that Plaintiff had been suffering from bilateral knee pain, pain in his left forearm, and back chronic pain. Dr. Pace wrote that Plaintiff was not able to sit or walk for prolonged periods of time. She also noted that Plaintiff had a "[m]oderate functional limitation but was able to work a few mo[nth]s ago without limit." R. 532. Due to opioid-related concerns and "[the] unremarkable exam without a lot of provoked pain," Dr. Pace

concluded "it is not clear to me that [additional] opioids are needed at this point." Id.

During an appointment in December 2012, Plaintiff reported to Dr. Pace that the Percocet was "very helpful for pain." R. 545. On February 11, 2013, however, Plaintiff reported to Dr. Pace that his knee pain had worsened despite still taking Percocet. He also reported that prolonged sitting was exacerbating the problem. Dr. Pace's notes indicated "knee exam is quite benign, minimally tender today." R. 580. She prescribed physical therapy, "education, evaluation, and treatment for bilateral knee osteoarthritis and possible patellofemoral syndrome." R. 579.

Throughout 2013, Plaintiff continued to complain of knee pain, and he underwent several x-ray examinations to get to the bottom of the problem. On March 6, 2013, Plaintiff reported to Dr. Pace that he was unable to exercise because of "injured knees." R. 587. Plaintiff stated that he had "been gaining weight since stopped playing basketball." Id. On April 14, 2013, an x-ray of the left knee revealed "[m]ild tricompartmental degenerative changes characterized by osteophyte formation and spiking of the tibial spines." R. 593. The x-ray also revealed "[n]o evidence of acute fracture or subluxation." Id. An x-ray of the right knee, taken on December 5, 2013, revealed "[s]mall osteophytes emanating from the tibial spines and of the

patella," "[m]ild degenerative change," "[m]oderate suprapatellar effusion," and "no acute fracture." R. 366. On December 6, 2013, Dr. Pace informed Plaintiff that another x-ray "showed some arthritis and some swelling," and referred him to the injection clinic to see if steroid injections might help with the pain. R. 636. On January 15, 2014, Dr. Pace noted that Plaintiff has "constant bilat[eral] knee pain with intermittent swelling," that it is "worse in [the] cold," and that "pain impairs sleep." R. 370. Dr. Pace prescribed Ibuprofen 600 mg and ice as well as a follow-up at the injection clinic and physical therapy. On January 31, 2014, Plaintiff reported to another doctor at Boston Medical Center, Dr. Jason Worcester, that the pain in his knees was "8/10" but that he had "no other joint pains." R. 353-354. Dr. Worcester noted that both knees exhibited no deformities, warmth, erythema, or anterior/posterior drawer, no effusion on the right and bilaterally good stability and full range of motion and intact sensation. R. 353. Dr. Worcester administered a right knee injection and recommended physical therapy. Plaintiff then returned to Dr. Worcester for an injection in his left knee on February 28, 2014. Dr. Worcester noted that the previous injection on Plaintiff's right knee provided "good relief" and that "[the knee] has remained relatively pain free except when

[Plaintiff] does a lot of walking." R. 332. Plaintiff reported "no other complaints" at that time. Id.

On June 6, 2014, Dr. Worcester examined Plaintiff and gave him another steroid injection in his right knee. Dr. Worcester noted, "R knee small effusion w/o warmth or erythema," "good lat[eral] and med[ial] stability," "full range of motion," "+ crepitus," "negative mcmurrays," "hip/ankle are normal." R. 326. Plaintiff indicated that he "rides a stationary bike," and "plays basketball at times," but that he had "not gone to physical therapy." Id. Dr. Worcester also wrote that "[range of motion] and streng[th] exercise were reviewed" with the Plaintiff. R. 328. On August 27, 2014, Plaintiff reported to Dr. Pace that he had an injection over the summer that was helpful but that the pain his knees had returned. Dr. Pace wrote that Plaintiff was benefiting from the steroid injections." Dr. Pace also noted Plaintiff was "referred to PT last visit, never went, placed referral again." R. 349. Dr. Pace directed Plaintiff to follow up in 6-7 months. On February 24, 2015, Plaintiff returned to Dr. Pace reporting that his knees continued to be "very painful in cold weather." R. 320. Dr. Pace noted that Plaintiff was "non-compliant with PT," and again referred him to physical therapy for his knee pain. R. 321.

On March 24, 2015, Plaintiff visited an orthopedist at Boston Medical Center, Dr. Alysia Green, for treatment of his

chronic knee pain. Plaintiff reported to Dr. Green that he was experiencing bilateral knee pain, ranking it as 7/10. He also stated that movement aggravates the pain and that he was not taking any daily pain medications. Dr. Green recorded "tenderness to palpation over the medial patellar retinaculum bilaterally as well as the medial joint lines. There is mild crepitus and he has pain with patellofemoral grind testing." R. 687-688. She also noted, "no bony defect, [n]o swelling, [n]o effusions, [n]o tenderness to palpation over the patellar or patella tendons." R. 687. X-rays taken that day showed "fragmentation of the lateral tibial spine [in the right knee]" as well as "some mild degenerative changes in the medial and lateral compartments of the right knee with mild degenerative changes in just the medial compartment of the left. No loose joint bodies." R. 405, 688. Dr. Green reviewed the x-rays with Plaintiff and chose to hold off on further injections. R. 688. Dr. Green noted, "[t]he patient was agreeable to [no injections]. He is going to start his physical therapy so we will start more conservatively." R. 688.

On June 24, 2015, Plaintiff saw Dr. Pace and reported "[h]aving occ[asional] peripheral edema, sometimes bad, in legs bilaterally." R. 1057. In the objective physical exam, Dr. Pace recorded "[m]ild medial patellar tpp, mild crepitus." Id. A month later, Plaintiff went back to Dr. Pace. Plaintiff reported

9

he had an upcoming appointment for an injection and that he was "[b]iking 3x/wk using helmet." R. 1060. Dr. Pace noted that Plaintiff had gained about fifteen pounds over the past year. They discussed a plan to have Plaintiff continue exercising via biking and to start making healthier eating choices.

On July 31, 2015, Plaintiff returned to Dr. Green complaining of bilateral knee pain. He requested and received a left knee injection from Dr. Green and reported that his right knee was "not causing him pain." R. 733-734. Dr. Green noted that Plaintiff had "mild crepitus," and "[p]ain with patellofemoral grind testing." R. 734. Her notes also indicate, "pain with palpation over the medial joint line on the left knee" but "[n]o pain to palpation over the medial joint line on the right [knee] and no tenderness to palpation of either lateral join lines." Id.

On January 19, 2016, Plaintiff told Dr. Pace that he had been experiencing pain in the ball of his right foot for about six weeks. X-rays taken on January 19, 2016 revealed: "[n]o fracture. Bone alignment is anatomic. Mild degenerative changes of the 1st metatarsophalangeal joint." R. 1139. On February 23, 2016, Dr. Pace noted that Plaintiff had "ongoing knee pain" and was "trying Bengay." R. 1084. In the "Assessment/Plan" section of his notes, Dr. Pace indicated "osteoarthritis of both knees"

and "refer to PT" as well as an "Ambulatory Referral to Physical Therapy: General." Id.

## II.  Treating Source Evaluation

On July 13, 2016, Dr. Pace completed a Physical Residual Functional Capacity ("RFC") questionnaire on behalf of Plaintiff. She noted that he suffered "[d]epression," "[b]ilat[eral] knee osteoarthritis," "[g]un shot wound," and "wrist pain." R. 742. In connection with his physical ailments, she recorded that Plaintiff suffered "severe intermittent pain in bilat[eral] knees [and] back," "stiffness in back," and "L[eft] elbow/wrist restriction in [range of motion]." Id. She also reported that Plaintiff's depression and anxiety were psychological conditions affecting the Plaintiff's physical condition. Id. With respect to Plaintiff's RFC, Dr. Pace estimated that he could sit for 20 minutes at a time; stand for 15 minutes at a time; sit, stand, and walk for 2 hours total in an 8-hour workday. R. 744. Dr. Pace answered "Yes" to a question asking, "Will your patient sometimes need to take unscheduled breaks during an 8 hour working day?" R. 745. Dr. Pace answered "Yes" to a question asking, "Does your patient need a job which permits shifting positions *at will* from sitting, standing or walking?" R. 744. Dr. Pace recorded that Plaintiff would "Occasionally" be able to lift 10 pounds and his impairments would produce "good days" and "bad days." R. 745-746. Dr. Pace

opined that Plaintiff's impairments would cause him to be absent from work "About three times a month." R. 746.

### III. **State Agency Reviewing Physicians' Diagnosis**

On December 15, 2015, state agency reviewing physician Dr. Swaran Goswami found that Plaintiff was "limited in lower extremities," and should never climb ropes, scaffolds, or ladders. R. 101. Dr. Goswami also explained that Plaintiff had "early" degenerative joint disease of the bilateral knees. Id.

On January 5, 2016, another state agency reviewing physician, Dr. Fischer, opined that Plaintiff is "[m]oderately limited" in his ability to: "understand and remember detailed instructions," "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," and "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." R. 102.

Both reviewing physicians in charge of making the determination found, based on the documented findings, that Plaintiff was "not disabled" and retained the capacity to work at a light level of exertion. R. 90, 104.

### IV. **Hearing Testimony**

At a hearing before the ALJ on September 9, 2016, Plaintiff testified that he continues to experience chronic pain in his back, knees, and feet. He estimated that his pain is an 8/10 and that it grows worse in cold weather. Due to this persistent

pain, Plaintiff claimed he can only walk continuously for a block and a half at a time, and he is unable to bend at the waist to touch his knees or toes without experiencing "a lot of pain." He also testified that he can only sit for fifteen to twenty minutes at a time, can only lift objects weighing less than 10 pounds, and cannot any lift objects off the ground. Plaintiff claimed that the pain was so severe that he was unable to participate in physical therapy to treat his underlying medical conditions.

**LEGAL STANDARD**

Under the Social Security Act, a claimant seeking benefits must prove that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The ALJ uses a five-step sequential evaluation process to assess a claim for disability benefits. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Purdy v. Berryhill, 887 F.3d 7, 9-10 (1st Cir. 2018). The evaluation ends at any step if the ALJ finds that the claimant is or is not disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied;

3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" ["RFC"] is such that he or she can still perform past relevant work, the application is denied; and 5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted."

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001)). A claimant's RFC is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Past relevant work encompasses "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [her] to learn to do it." Id. §§ 404.1560(b)(1), 416.960(b)(1). If a claimant cannot still perform her past relevant work, the ALJ will assess whether there is any other work the claimant "can adjust to" that "exist[s] in significant numbers in the national economy." Id. §§ 404.1560(c)(1), 416.960(c)(1).

The claimant bears the burden of proof for steps one through four. Purdy, 887 F.3d at 9. If the analysis proceeds to step five, the Government bears the burden of proof to present evidence of specific jobs the applicant can perform. Id. at 10.

## PROCEDURAL HISTORY

On March 6, 2015, the Plaintiff filed an application for SSI alleging disability beginning on July 25, 2014. The claim

was denied initially on November 1, 2015 and upon reconsideration on January 5, 2016. On January 28, 2016, the Plaintiff filed a written request for a hearing, which was held on September 9, 2016. Estelle R. Hutchinson, an impartial vocational expert appeared at the hearing. The Plaintiff testified with the assistance of a Spanish interpreter, and Attorney Eneida Sanchez represented the Plaintiff.

On November 10, 2016, ALJ Henry J. Hogan issued his decision. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 6, 2015, the application date. At step two, the ALJ found that Plaintiff had the following "severe" impairments: anxiety, post-traumatic stress disorder, and affective disorder. He also found that Plaintiff had the following "non-severe" impairments: diabetes mellitus, osteoarthritis and allied disorders, sleep apnea, obesity, and hypertension. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. Next, the ALJ assessed Plaintiff's RFC and found the following:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can never climb ladders, ropes or scaffolds. He can occasionally stoop, crouch, kneel, and crawl. His work is limited to simple, routine and repetitive

tasks. He can have only occasional interaction with
the public that is superficial, interpersonal
interactions. He can have only occasional interaction
with co-workers involving no tandem tasks. He can work
with only occasional (less than one-third of an eight-
hour workday) supervision.

R. 41.

At step four, the ALJ found Plaintiff would be unable to
perform any past relevant work. At step five, the ALJ considered
the claimant's age, education, work experience, and RFC and
found that jobs exist in significant numbers in the national
economy that Plaintiff can perform. Thus, the ALJ found that
Plaintiff had not been disabled, as defined in the Social
Security Act, since March 6, 2015 when he filed his application.

## STANDARD OF REVIEW

A district court reviews an ALJ's decision "to determine
'whether the final decision is supported by substantial evidence
and whether the correct legal standard was used'." Coskery v.
Berryhill, 892 F.3d 1, 3 (1st Cir. 2018) (quoting Seavey, 276
F.3d at 9). The substantial evidence standard is "not high" and
requires only "such relevant evidence as a reasonable mind might
accept as adequate to support [the] conclusion." Biestek v.
Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison
Co. v. NLRB, 305 U.S. 197, 229 (1938)). "In applying the
'substantial evidence' standard, the Court must bear in mind
that it is the province of the ALJ, not the Court, to find

facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence." Johnson v. Colvin, 204 F. Supp. 3d 396, 407 (D. Mass. 2016) (citing Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)).

In reviewing for legal error, "[f]ailure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996). Where application of the correct legal standard could lead to a different conclusion, the agency's decision must be remanded. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000). However, remand is not necessary if it "will amount to no more than an empty exercise." Id.

## DISCUSSION

Plaintiff identifies four errors in the ALJ's decision that he believes require reversal and remand. First, the ALJ erred at step two by finding Plaintiff's bilateral osteoarthritis of the knee to be a non-severe condition. Second, the ALJ erred at step four in failing to properly evaluate Plaintiff's subjective pain symptoms as part of the RFC analysis. Third, the ALJ also erred at step four by not giving Dr. Pace's RFC assessment controlling

17

weight. Fourth, the ALJ erred at step five by failing to consider his English illiteracy in assessing his ability to find gainful employment. The Court agrees with Plaintiff that the ALJ failed to properly weigh the medical opinions by discounting the opinion of his treating source. Accordingly, the Court does not address the substance of Plaintiff's alternative arguments. The ALJ's failure to give Dr. Pace's opinion controlling weight requires the case be remanded for a new hearing.

## I.    **The Treating Source Rule**

Under the applicable regulations, a "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law." 20 C.F.R. §§ 404.1502(d), 416.902(i). An "acceptable medical source" includes a "licensed physician." Id. §§ 404.1502(a)(1), 416.902(a)(1). A "treating source" is an "acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." Id. §§ 404.1527(a)(2), 416.927(a)(2). Dr. Pace qualifies as a treating source because she is a primary care physician who saw Plaintiff at multiple appointments over four years.

The ALJ must give "[c]ontrolling weight . . . to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion is 'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the record." Johnson, 204 F. Supp. 3d at 409 (quoting 20 C.F.R. § 404.1527(c)(2)). Even if not given controlling weight, a treating source's medical opinion generally receives more weight than opinions from other medical sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Purdy, 887 F.3d at 13.[2]

That said, several factors determine the appropriate weight to give to the opinions of treating and other medical sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). For all sources, the ALJ must consider whether the source examined the claimant, the support the source provides for her opinion, the consistency of the opinion with the record as a whole, and the specialty of the source. Id. For a treating source, the length, nature, and extent of the treatment relationship and frequency of examination are also relevant considerations. Id. §§ 404.1527(c)(2)(i)-(ii), 416.927(c)(2)(i)-(ii). An ALJ need not expressly address each factor identified by the regulations but must provide "good reasons" for the weight assigned to the opinion of a treating source. Bourinot v. Colvin, 95 F. Supp. 3d

<hr>

[2]    20 C.F.R. §§ 404.1520c, 416.920c contain new rules regarding the weight given to treating sources that apply to claims filed on March 27, 2017 or later. See Purdy, 887 F.3d at 13. Because Plaintiff filed his claim on March 6, 2015, the old rules apply.

161, 177 (D. Mass. 2015); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

## II.  Dr. Pace's Opinion

The ALJ did not provide adequate reasons for his weighing of the medical opinions, specifically Dr. Pace's assessment of Plaintiff's RFC. Instead, the ALJ gave great weight to the opinions of the non-examining state agency medical consultants "to the extent that their assessments were consistent with the medical evidence of record," though he did acknowledge that they differed regarding the severity of conditions. R. 43, 101, 102. He afforded little weight to the opinion of Dr. Pace, Plaintiff's primary care physician and a treating source, on the basis that Dr. Pace's opinions were vague and unsubstantiated. Not only did Dr. Pace provide an assessment of Plaintiff's RFC, but, on February 24, 2015, she wrote that Plaintiff had a disability that "is expected to be of long and continued duration" and "limits his ability to work in most employment types." R. 637. He also gave little weight to the opinion of Dr. Hernandez who noted that Plaintiff had a disability that would "limits his ability to work or perform one or more daily living activities." R. 42-43, 315.

The ALJ's rationale for why he granted more authority to certain opinions is unpersuasive and does not constitute the necessary "good reasons." The ALJ faulted Dr. Pace's RFC

recommendation because it was on "pre-printed standard form."
However, the doctor did more than just check boxes, and the form
included a more detailed description of Plaintiff's ailments and
ability to function. The format of Dr. Pace's RFC assessment
does not detract from the fact that her opinions are consistent
with the record as a whole and sufficiently specific to warrant
controlling weight. Compare Coggon v. Barnhart, 354 F. Supp. 2d
40, 53 (D. Mass. 2005) (treating a disability questionnaire
completed by a doctor as an advocacy opinion warranting little
weight, because the results of the questionnaire were
unsupported by the record and the doctor was no longer actively
involved in treatment), with Kem v. Berryhill, 352 F. Supp. 3d
101, 114 (D. Mass. 2018) (finding the ALJ erred in disregarding
treating physician's mental RFC questionnaire when the ALJ
failed to identify any specific parts of the record he found
inconsistent with the physician's determinations).

Plaintiff has been diagnosed by several doctors with
serious physical conditions, at least two of whom -- Dr.
Hernandez and Dr. Pace -- have opined that these conditions will
limit his ability to function. The treating physicians' opinions
are corroborated by the medical evidence in the record,
including the notes from the objective examinations and x-rays.
Over the course of numerous physical examinations spanning
multiple years, Plaintiff consistently reported suffering a

great deal of pain in his knees, back, and feet. Dr. Pace's RFC assessment, which she completed based on 4 years of treating Plaintiff, notes "severe intermittent pain in bilat[eral] knees [and] back." R. 76. This is consistent with and supported by her own objective findings, her lengthy treatment and observations, and her evaluation of Plaintiff's reports as to the severity of his pain. See Carbone v. Sullivan, 960 F.2d 143 (1st Cir. 1992) (unpublished table decisions) (observing that "objective medical evidence of disabling pain need not consist of concrete physiological data alone but can consist of a medical doctor's clinical assessment" (quoting Gatson v. Bowen, 838 F.2d 442, 447 (10th Cir. 1988)).

The ALJ also claimed that Dr. Pace's RFC assessment is inconsistent with Plaintiff's activities of daily living ("ADLs"). Specifically, the ALJ pointed to Plaintiff's bike riding as evidence that Dr. Pace's opinion is not entitled to controlling weight. Plaintiff testified before the ALJ that he used a bicycle in the past for physical therapy at his doctors' recommendation. However, he clarified that he only uses it now once or twice a month because it is too painful to do more. Plaintiff also reported to his doctors in 2014 and 2015 that he would ride a bicycle a few times a week. As the ALJ noted elsewhere in his opinion, the record evidence only suggests that Plaintiff engaged in "occasional bicycling." R. 41-42. This is

not inconsistent with the severe intermittent knee and back pain described by Dr. Pace, nor is it inconsistent with her assessment of Plaintiff's exertional limits. The ALJ evidently disagreed with Dr. Pace's assessment of the severity of Plaintiff's bilateral knee osteoarthrosis, but he is not entitled to substitute his own lay opinion for that of a medical source. See Banushi v. Barnhart, No. Civ. A. 06-10042-RWZ, 2007 WL 1858658, at *7 (D. Mass. June 26, 2007); see also Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986) (finding that the ALJ must "obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant" before discounting subjective complaints of pain). Thus, the evidence of Plaintiff's ADLs currently in the record does not provide a sufficient basis for discounting Dr. Pace's opinion.

In sum, since the ALJ did not sufficiently justify giving little weight to Dr. Pace's opinion, remand is required. Lemieux v. Berryhill, 323 F. Supp. 3d 224, 229 (D. Mass. 2018); see also Linehan v. Berryhill, 320 F. Supp. 3d 304, 306 (D. Mass. 2018) ("A goal of the treating source rule is to function as a procedural safeguard. Where . . . the Court cannot ascertain 'a clear understanding of why the ALJ rejected [the treating doctor's] opinion,' the goal of the treating source rule is not met." (second alteration in original) (citation omitted)

(quoting Francis v. Comm'r Soc. Sec. Admin., 414 F. App'x 802, 804 (6th Cir. 2011))). Properly weighing the opinions of the medical sources, the ALJ could well have reached a different conclusion regarding Plaintiff's RFC. See Ward, 211 F.3d at 656.[3]

### ORDER

For the reasons stated above, the Court **DENIES** the Government's motion to affirm the Commissioner's decision (Dkt. No. 21) and **ALLOWS** Plaintiff's motion to reverse and remand (Dkt. No. 16).

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge

---

[3]    The Court also notes that the ALJ discounted the Commonwealth of Massachusetts' determination that Plaintiff is disabled. Although the Commonwealth's determination is not controlling in the same way as a treating source's opinion, the ALJ still failed to provide persuasive reasons why he reached a different conclusion as to Plaintiff's condition. In discounting the Commonwealth's determination, the ALJ only provided the reason that the Commonwealth and the Social Security Administration have different durational requirements for a condition to qualify as a disability (i.e., six months under the Commonwealth's standard versus one year under the federal standard). Yet nowhere in the ALJ's decision is the duration of Plaintiff's condition cited as a relevant issue.